IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF IOWA
CEDAR RAPIDS DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>    Plaintiff,<br><br>vs.<br><br>KENNETH GRAGG,<br><br>    Defendant. | No. CR13-0059<br><br>REPORT AND RECOMMENDATION |

## TABLE OF CONTENTS

*I.*    *INTRODUCTION* .................................................. 1

*II.*   *PROCEDURAL HISTORY* ...................................... 2

*III.*  *RELEVANT FACTS* .............................................. 2

*IV.*  *DISCUSSION* ........................................................ 6
     A.   *Probable Cause* ............................................... 6
           1.   *MS's reliability* ......................................... 7
           2.   *Staleness* .................................................... 8
     B.   *Good-Faith Exception* ................................... 11

*V.*    *RECOMMENDATION* ......................................... 14

## I. INTRODUCTION

On the 27th day of September 2013, this matter came on for hearing on the Motion to Suppress (docket number 15) filed by the Defendant on September 17, 2013. The Government was represented by Assistant United States Attorney Justin Lightfoot. Defendant Kenneth Gragg appeared in person and was represented by his attorney, Jill M. Johnston.

## II. PROCEDURAL HISTORY

On August 15, 2013, Defendant Kenneth Gragg was charged by Indictment with two counts of distribution of a controlled substance, one count of possession with intent to distribute a controlled substance, and one count of possession of a firearm by an unlawful user of a controlled substance. At the arraignment on August 20, 2013, Defendant entered a plea of not guilty and trial was set for October 21, 2013. On Defendant's oral motion made at the instant hearing, the trial was continued to December 16, 2013.

On September 17, 2013, Defendant timely filed the instant motion to suppress. The Government filed its resistance on September 23, 2013.

## III. RELEVANT FACTS

In lieu of offering testimony at the instant hearing, the parties filed a "Joint Stipulation Regarding Suppression Motion." According to the stipulation, Judge Sean W. McPartland, an Iowa District Court Judge, issued a search warrant on January 10, 2013, authorizing law enforcement to search Defendant's residence in Garrison, Iowa. Defendant was the only person who resided at the residence at that time. The search warrant was executed on January 15, 2013. Officers seized a shotgun, two AK47 clips, controlled substances, and drug paraphernalia.

Attached to the joint stipulation are copies of the application for search warrant submitted to Judge McPartland, and the resulting search warrant. Defendant agrees that the information in the search warrant application and supporting affidavit may be considered true for purposes of this motion. That is, Defendant admits that the statements attributed to M.S. and C.S. were made by them, but does not admit that the substance of those statements is true. A review of the application reflects Judge McPartland was advised of the following:

1. The affiant, Mark H. Phippen, is a Benton County Deputy Sheriff with 28-1/2 years experience, including a part-time assignment to the Rural Area Interdiction Detail ("RAID"), a multi-jurisdictional drug task force, since 1992.

2. On May 3, 2005, a confidential informant ("CI") told Phippen that Kenneth Gragg (Defendant herein) deals methamphetamine and marijuana. The CI told Phippen that he had seen Defendant deal methamphetamine 10-12 times and had purchased 4-5 times for himself.

3. The CI also told Phippen that Defendant had two firearms in his bedroom, including a fully automatic assault rifle and a sawed-off shotgun.

4. The CI told Phippen that Defendant resided in a trailer at the intersection of Highway 8 and Highway 218 in Benton County. Phippen was able to "confirm" Defendant's address on 58th Street in Garrison, Iowa.

5. On November 15, 2006, Phippen and other law enforcement personnel went to Defendant's residence on 58th Street in Garrison, based on information that a possible federal fugitive may be hiding there. Defendant gave law enforcement permission to look through the trailer for the wanted person.

6. While looking through the trailer, Phippen observed a glass pipe indicative of the use of methamphetamine. Defendant admitted being a drug user and admitted possessing firearms. Seven firearms were seized — including an AK47 and a shotgun (not sawed-off) — and a small amount of marijuana.

7. The seizure of the AK47, shotgun, marijuana, and packaging material corroborated the information provided by the CI in May 2005.

8. "Within the past year" Phippen received information from another law enforcement agency that Defendant was associating with a known drug dealer from the Marshalltown area.

9. In November 2012, "MS" was in custody in the Benton County Jail for a probation revocation.[1] MS's criminal history includes convictions for making false reports to law enforcement, possession of methamphetamine and drug paraphernalia, and forgery and theft in the second degree.

10. MS told jail staff that she would like to speak with Deputy Phippen. MS then told Phippen that she would "like to broker a deal in exchange for leniency on her probation revocation." According to MS, she could buy methamphetamine from Defendant, and had spent over $35,000 [presumably on controlled substances] from 2006 "until now."

11. Phippen and MS discussed an incident which occurred approximately six months earlier, in the spring of 2012. Phippen observed MS's vehicle parked at Defendant's trailer. After MS left, Phippen conducted a vehicle stop. Phippen asked MS how much meth she had just purchased. MS told Phippen at that time that she had not purchased anything and would allow her vehicle to be searched. Phippen searched the vehicle and found nothing. Two days later, MS called Phippen and asked to speak with him. MS then came to Phippen's office "and apologized for the incident a few days before saying that she had lied and had gotten meth from Ken Gragg and when she saw your affiant she got scared and ate the meth."

12. The Benton County Attorney's Office agreed that MS would be released from jail, that she would make three controlled buys from Defendant, and upon completion "she would receive consideration on her probation revocation."

13. As part of the agreement, MS was required to "drop a UA" before and after each controlled purchase. MS's first UA drop was on November 27, 2012, and was

---

[1] MS is identified by name in the affidavit attached to the application for search warrant.

4

negative. "Safeguards were taken to watch [MS] drop her UA due to in the past she has brought in other urine specimens to pass the UA."

14. The first controlled buy was on November 28, 2012. MS met at the Buchanan County Sheriff's Office, where she and her vehicle were searched by a female officer. She was then equipped with a recording device and provided buy money. Law enforcement officers, including Phippen, followed MS to Defendant's trailer. MS gave Defendant $120 in exchange for one gram of methamphetamine, which was the price agreed to on the phone. MS was then surveilled as she returned to the sheriff's office, where the evidence was secured and a post-buy search was conducted of MS and her vehicle.

15. On November 29, 2012, MS provided a UA, which tested negative.

16. On December 3, 2012, MS submitted another UA, which also tested negative.

17. The second controlled buy occurred on December 4, 2012. The same procedure which was used on November 28 was used on December 4.

18. On December 5, 2012, MS submitted a UA, which tested negative.

19. On December 19, 2012, MS was arrested in Vinton for shoplifting and taken to the Benton County Jail. Because of her additional criminal activity, the cooperating individual agreement reached with law enforcement was "deactivated."

20. The substance purchased during the controlled buys has been tested and confirmed to be methamphetamine.

## IV. DISCUSSION

Defendant argues that the affidavit submitted to Judge McPartland failed to establish probable cause to search Defendant's residence. Specifically, Defendant asserts that the information in the affidavit was stale and that MS was unreliable. Defendant also notes that the search warrant was not executed until five days after it was issued. Finally,

Defendant claims that the *Leon* good faith doctrine is inapplicable "because no reasonably well-trained officer could have believed that the affidavit could have established probable cause."

## A. Probable Cause

The Fourth Amendment to the United States Constitution protects persons and their houses against unreasonable searches and seizures. A warrant is required to search a person's house, with certain exceptions not applicable here. *Kentucky v. King*, ___ U.S. ___, 131 S. Ct. 1849, 1856 (2011). "[N]o Warrants shall issue, but upon probable cause, supported by Oath or affirmation." U.S. CONST. AMEND. IV. In making a probable cause determination, "[t]he task of the issuing magistrate is simply to make a practical, common-sense decision whether, given all the circumstances set forth in the affidavit before him, including the 'veracity' and 'basis of knowledge' of persons supplying hearsay information, there is a fair probability that contraband or evidence of a crime will be found in a particular place." *Illinois v. Gates*, 462 U.S. 213, 238 (1983). Stated otherwise:

> If an affidavit in support of a Search Warrant "sets forth sufficient facts to lead a prudent person to believe that there is a 'fair probability that contraband or evidence of a crime will be found in a particular place,'" probable cause to issue the warrant has been established.

*United States v. Grant*, 490 F.3d 627, 631 (8th Cir. 2007) (quoting *United States v. Warford*, 439 F.3d 836, 841 (8th Cir. 2006)). Probable cause "is a fluid concept that focuses on 'the factual and practical considerations of everyday life on which reasonable and prudent men, not legal technicians, act.'" *United States v. Colbert*, 605 F.3d 573, 577 (8th Cir. 2010) (quoting *Gates*, 462 U.S. at 231). As such, the Court examines the sufficiency of a search warrant affidavit using a "common sense" and not a "hypertechnical" approach. *Grant*, 490 F.3d at 632 (citing *United States v. Solomon*, 432 F.3d 824, 827 (8th Cir. 2005)).

The totality of the circumstances is considered in determining whether probable cause was established to issue a search warrant. *Id.* at 631 (citation omitted). In this case, no oral testimony was present to Judge McPartland when the search warrant was issued. When an issuing judge relies solely on the written application to issue a search warrant, "only that information which is found within the four corners of the affidavit may be considered in determining the existence of probable cause." *Solomon*, 432 F.3d at 827. Here, Judge McPartland concluded that the information provided by Deputy Phippen in the application established probable cause, and he issued a warrant to search Defendant's residence.

### 1. MS's reliability

Defendant first argues that probable cause was lacking because "MS's information is suspect for a whole host of reasons."[2] Defendant notes that MS contacted law enforcement for the purpose of obtaining leniency on her pending probation revocation. She was a known substance abuser and had cheated previously on urinalysis tests. When stopped by Deputy Phippen earlier in 2012, she initially lied about the purchase of methamphetamine from Defendant. Moreover, she had been previously convicted of making a false report to law enforcement.

Defendant's argument ignores the fact, however, that law enforcement did not simply accept MS's representation that Defendant was a drug dealer. Instead, it conducted two controlled buys in which *drugs were purchased from Defendant at his residence*. The controlled buys were surveilled and recorded. Accordingly, law enforcement knew that Defendant was selling methamphetamine from his residence because it had recently conducted two controlled buys at that location. That is, MS's representations that Defendant was a drug dealer were corroborated by the controlled buys surveilled and

---

[2] Defendant's Brief (docket number 15-1) at 6.

recorded by law enforcement. It is not uncommon that a cooperating individual is motivated by a desire to "work off" other violations. Regardless of MS's motivation, however, the information she provided was corroborated by the subsequent buys.

Defendant also complains that there is insufficient information in the affidavit to support a finding that the unnamed confidential informant in 2005 was reliable. I believe it is unnecessary to address this issue because information regarding Defendant's drug dealing in 2005 is not critical to the establishment of probable cause here. The Court notes parenthetically, however, that the information provided by the confidential informant in 2005 would seem to be corroborated by a search conducted of Defendant's residence in 2006.

### 2. *Staleness*

Next, Defendant argues that probable cause was lacking because the information contained in the affidavit was "too stale." The controlled purchases of methamphetamine at Defendant's residence occurred on November 28, 2012 and December 4, 2012. Deputy Phippen did not seek a search warrant until January 10, 2013, and the warrant was not executed until January 15, 2013.

"Probable cause must exist when a warrant is issued, not merely at some earlier time." *United States v. LaMorie*, 100 F.3d 547, 554 (8th Cir. 1996). *See also United States v. Jeanetta*, 533 F.3d 651, 654-55 (8th Cir. 2008). However, there is no "fixed formula," *United States v. Smith*, 266 F.3d 902, 904 (8th Cir. 2001), or "bright-line test," *Jeanetta*, 533 F.3d at 655, for determining when information has become stale. Instead, the court must consider the nature of the crime being investigated and the property to be searched. *United States v. Nieman*, 520 F.3d 834, 839 (8th Cir. 2008).

Here, Defendant notes that the last controlled buy at Defendant's house occurred on December 4, 2012, some 37 days prior to Deputy Phippen submitting his application for a search warrant. Defendant asserts that "[d]rugs are easily disposed of, transported,

8

or used."[3] Defendant argues that "[w]ithout any information that Mr. Gragg was producing methamphetamine, or keeping large quantities at his home, and given the disposable nature of narcotics, probable cause for the search of Mr. Gragg's home had evaporated by the time Deputy Phippen applied for the warrant."[4] The Government asserts, on the other hand, that the information contained in the affidavit indicates Defendant was involved in the sale of methamphetamine for several years and "there is no reason to believe that Defendant would have stopped dealing drugs just thirty-seven days after the last controlled buy."[5]

In his affidavit, Deputy Phippen advised Judge McPartland that a confidential informant told Phippen in 2005 that Defendant was dealing drugs and the CI had purchased drugs directly from Defendant. The CI identified Defendant's residence and told Phippen that Defendant had an assault rifle and a shotgun at his residence. That information was corroborated the following year when law enforcement searched Defendant's residence looking for a federal fugitive. Judge McPartland was also told Phippen received information from another law enforcement agency within the past year that Defendant was associating with a known drug dealer from Marshalltown.

In the spring of 2012, Deputy Phippen was surveilling Defendant's trailer, when he observed MS's vehicle. MS was stopped after leaving Defendant's home and initially denied purchasing methamphetamine. MS contacted Phippen two days later, however, admitted she had lied, and told Phippen that she had purchased methamphetamine from Defendant at his residence.

---

[3] Defendant's Brief (docket number 15-1) at 5.

[4] *Id.*

[5] Government's Memorandum (docket number 20-1) at 8.

In November 2012, MS contacted Deputy Phippen after being arrested for a probation violation and advised him that she continues to purchase substantial amounts of methamphetamine. MS agreed to conduct three controlled buys from Defendant, in exchange for leniency on her probation revocation. Two of the controlled buys were completed, when MS was arrested for shoplifting and the agreement was discontinued.

"Where continuing criminal activity is suspected, the passage of time is less significant." *United States v. Formaro*, 152 F.3d 768, 771 (8th Cir. 1998) (quoting *United States v. Koelling*, 992 F.2d 817, 822 (8th Cir. 1993)). "Indeed, 'in investigations of ongoing narcotics operations, intervals of weeks or months between the last described act and the application for a warrant did not necessarily make the information stale.'" *Id.* (quoting *United States v. Ortiz*, 143 F.3d 728, 732-33 (2d Cir. 1998)). In fact, "with respect to drug trafficking, probable cause may continue for several weeks, *if not months*, of the last reported instance of suspect activity." *Id.* (quoting *United States v. Angulo-Lopez*, 791 F.2d 1394, 1399 (9th Cir. 1986)) (Italics in original).

In *United States v. Smith*, 266 F.3d 902 (8th Cir. 2001), the defendant argued that the search warrant was not supported by probable cause "because the information in the affidavit regarding drug transactions at the house was approximately three months old." *Id.* at 904. The Court disagreed and affirmed the defendant's conviction, citing *United States v. Maxim*, 55 F.3d 394 (8th Cir. 1995). In *Maxim*, the Court held that information four months old, or even three years old, may supply probable cause for a warrant to search the home of someone suspected of illegal possession of a firearm. In rejecting the defendant's argument to distinguish *Maxim*, the Court concluded that "[w]e cannot agree that drugs are significantly more mobile than guns." *Id.* at 905.

As set forth above, probable cause exists to support the issuance of a search warrant if sufficient facts lead a prudent person to believe that there is a "fair probability that contraband or evidence of a crime will be found in a particular place." *Gates*, 462 U.S.

at 238; *Grant*, 490 F.3d at 631. Based on all the information set forth in the affidavit, I believe a prudent person could conclude that there was a fair probability that methamphetamine would be found at Defendant's residence. MS reported that she had been consistently buying methamphetamine from Defendant. Her assertions were corroborated by two controlled buys conducted just over one month prior to the issuance of the warrant. Under these circumstances, the information provided in the search warrant application was not stale.

Defendant also complains that the search warrant was not executed until five days after its issuance. For the reasons set forth above, I do not believe this short delay defeated probable cause. *Formaro*, 152 F.3d at 771 ("Because continuing criminal activity was suspected and corroborated, probable cause did not dissipate in the seven days that lapsed between the time the state court issued the warrant and its execution.") (quoting *United States v. Gibson*, 123 F.3d 1121, 1125 (8th Cir. 1997)); *United States v. Williams*, 10 F.3d 590, 594-95 (8th Cir. 1993) (given ongoing nature of drug trafficking, eight-day delay did not invalidate search); *United States v. Carnahan*, 684 F.3d 732, 736 (8th Cir. 2012) (rejecting the defendant's suggestion that the warrants lacked probable cause because they were not executed for five to seven days after issuance).

### B. Good-Faith Exception

As set forth above, I believe the search warrant executed on January 15, 2013 was supported by probable cause. That is, the warrant was valid and the search was lawful. Because there was no Fourth Amendment violation, I believe it is unnecessary to consider whether the *Leon* good-faith exception precludes suppression of the seized evidence.[6]

---

[6] The issues of probable cause and the good-faith exception may be addressed by the district court in either order. That is, if the district court finds that probable cause existed for the issuance of the search warrant, then it need not address the *Leon* issue. On
(continued...)

11

Nonetheless, I will address the issue in case the district court disagrees with my analysis on probable cause.

The Constitution does not expressly prohibit the introduction of evidence obtained in violation of the Fourth Amendment. *United States v. Leon*, 468 U.S. 897, 906 (1984). Rather, the exclusionary rule is "a judicially created remedy designed to safeguard Fourth Amendment rights generally through its deterrent effect, rather than a personal constitutional right of the party aggrieved." *Id.* (quoting *United States v. Calandra*, 414 U.S. 338, 348 (1974)). The Court noted in *Leon* that it "frequently questioned whether the exclusionary rule can have any deterrent effect when the offending officers acted in the objectively reasonable belief that their conduct did not violate the Fourth Amendment." *Id.* at 918. After reviewing the purposes of the exclusionary rule, the Court concluded that "evidence obtained in objectively reasonable reliance on a subsequently invalidated search warrant" will not be suppressed. *Id.* at 922. An officer's reliance on a search warrant is not "objectively reasonable," however, if one of four circumstances is present:

> The Supreme Court has identified four circumstances in which an officer's reliance on a search warrant would be objectively unreasonable: (1) when the affidavit or testimony in support of the warrant included a false statement made knowingly and intentionally or with reckless disregard for its truth, thus misleading the issuing judge; (2) when the judge "wholly abandoned his judicial role" in issuing the warrant; (3) when the affidavit in support of the warrant was "so lacking in

---

[6](...continued)
the other hand, if the district court concludes that the *Leon* good-faith exception is applicable, then it need not address the issue of whether the search warrant is supported by probable cause. *See, e.g., United States v. Pruett*, 501 F.3d 976, 979 (8th Cir. 2007) ("If the District Court was correct in concluding that the *Leon* good-faith exception to the exclusionary rule applies, it is unnecessary for us to engage in a probable-cause analysis."); *United States v. Ross*, 487 F.3d 1120, 1122 (8th Cir. 2007); *United States v. Puckett*, 466 F.3d 626, 629 (8th Cir. 2006).

indicia of probable cause as to render official belief in its existence entirely unreasonable"; and (4) when the warrant is "so facially deficient" that the executing officer could not reasonably presume the warrant to be valid.

*Grant*, 490 F.3d at 632-33 (citing *Leon*, 468 U.S. at 923).

Anticipating the Government's good-faith argument, Defendant addressed the *Leon* issue in the brief filed in support of his motion to suppress. Defendant argues that the exception found in *Leon* to the exclusionary rule is not applicable because the officers' reliance on the search warrant here was not "objectively reasonable." Specifically, Defendant relies on the third prong in *Leon*, which provides that an officer's reliance on the search warrant is not objectively reasonable if the affidavit is "so lacking in indicia of probable cause as to render official belief in its existence entirely unreasonable." *Grant*, 490 F.3d at 632-33; *Leon*, 468 U.S. at 923.

In *United States v. Ross*, 487 F.3d 1120 (8th Cir. 2007), the Court noted that "'entirely unreasonable' is not a phrase often used by the Supreme Court, and we find nothing in *Leon* or in the Court's subsequent opinions that would justify our dilution of the Court's particularly strong choice of words." *Id.* at 1122-23 (quoting *United States v. Carpenter*, 341 F.3d 666, 670 (8th Cir. 2003)). As set forth above, I believe the search warrant application and supporting attachments establish probable cause to search Defendant's residence. Even if the district court finds that probable cause was lacking, however, it was not "so lacking" that the officers' reliance on the search warrant was "entirely unreasonable." *See also United States v. Gibson*, 928 F.2d 250, 253 (8th Cir. 1991) ("Ordinarily, a police officer cannot be expected to question a judge's probable cause determination.").

## V. RECOMMENDATION

For the reasons set forth above, I respectfully recommend that Defendant's Motion to Suppress (docket number 15) be **DENIED**.

The parties are advised, pursuant to 28 U.S.C. § 636(b)(1), that within fourteen (14) days after being served with a copy of this Report and Recommendation, any party may serve and file written objections with the district court. *The parties are reminded that pursuant to Local Rule 72.1, "[a] party asserting such objections must arrange promptly for a transcription of all portions of the record the district court judge will need to rule on the objections." Accordingly, if the parties are going to object to this Report and Recommendation, they must promptly order a transcript of the hearing held on September 27, 2013.*

DATED this 1st day of October, 2013.

_____
JON STUART SCOLES
CHIEF MAGISTRATE JUDGE
NORTHERN DISTRICT OF IOWA